Good morning, Your Honor. Dan Stormer. May it please the court, Dan Stormer on behalf of the appellant. I'd like to reserve five minutes for rebuttal. The issue before the court is the extent to which the Torture Victim Prevention Act provides or doesn't provide any immunities, whether they're absolute, deferential, or totally disallowed under the Use Cogents concept. The defendant or the appellant's position is clear. They say because the pleading in the TVPA requires a finding under color of law or apparent authority of law of a foreign nation, that automatically triggers complete and absolute deference because that's the standard they use for purposes of granting immunity in this suggestion of immunity process. And the court simply could not have meant that when it created the TVPA. And we know the court didn't create the TVPA. I'm sorry, I apologize. When Congress created and the executive signed it ultimately. So there are a series of reasons why that could not be. But before you get to those series of reasons, we know that we're not the first to trod this path. We know it because the court in the Supreme Court in Samantar in 2010 made quite clear that the immunity issue that the defendant appellees rely upon, it only applies to status immunity for heads of state, agencies, or instrumentalities. So if that is correct, and the court says it is, then there is, as the court stated, no such, there's no conduct related immunity. So talking about Samantar, which held that FISA did not apply to an individual Somali, right? That FISA did not apply. And then they went on to talk, probably in dicta, as to whether common law immunity applied. That's correct. So your position is, let me get it clear, you're saying that Samantar didn't say anything about common law immunity to someone who is not a head of state? It said that for It said the only immunity which attaches is status-based immunity that is created by head of state, agency, or instrumentality. That's not exactly the way I remember reading Samantar, but go ahead. Samantar says that the FSIA did three things, essentially. It codified the It moved the decision of immunity from the State Department to the courts under FSIA. And lastly, it codified international law, that it has made international law part of the FISA statute, FSIA. And it said, although cases involving individual foreign officials as typically followed, when a foreign official asserted immunity, it didn't say heads of state, agencies, and institutions. I could, I could, I think we've cited that portion in our brief, but I would, I would be unhappy to be wrong, but I don't think I am. Well, either you're wrong, or what I just read from the Supreme Court of the United States is wrong. And I rather think that it's maybe you. Well, it's happened. Okay. You argue there's an exception, I think if I understand your argument, there's an exception to the common law conduct immunity doctrine for violations of Judge Kogan's norms? That's correct. All right. But I guess my, it doesn't, does that create some sort of proof problem? Because the plaintiff is, it seems to me, is always going to say that it's just Kogan's, Judge Kogan's violation, and the state requesting immunity is always going to say it is a lawful action taken in official capacity. How does the court resolve this at the motion to dismiss stage? Well, it has to be torture or an extra judicial killing. And, and that's always going to be disputed, isn't it? Well, I mean, here it seems, isn't it disputed what occurred? I know we have some reports that say some things and other reports that say other things. Well, it's undisputed as the following facts, that he was shot from the helicopter four times in the back. It is undisputed that as he lay while still alive on the deck of the ship, after he had only been filming and not participating in anything else, he was shot right in the face. And that is what killed him. Those are undisputed facts. Is it also, I mean, was the blockade legal? Whether or not the blockade is legal is irrelevant to the determination of whether Eusekogin's applies. Eusekogin's, particularly in the Ninth Circuit, which has a fairly robust history of addressing the issue. There are at least five or six cases which directly addresses Hillel, Trujano, Doe, Miros Kandari and a couple of others have found uniformly that there, that there cannot be a claim that it's acting appropriately when it is one, when there is a Eusekogin's defense. So then what's the answer to my question? Then it's... The answer to the defense is what the appellees will say, which is it's artful pleading. You have to, at the pleading stage, now there may be the possibility of entering into a process by which there is some challenging of the facts. And here the trial court did a bit of each in its ultimate, the last component of its finding. And have you basically let go of your claims against Mr. Baraka under the Anti-Terrorism Act, the Alien Tort Claims Act, because it seems like you only address the TVPA in your brief. I think our focus is TVPA. And can you give me, I guess your best case, preferably Supreme Court or in circuit, that clearly sets forth the distinction between conduct-based immunity and status-based immunity besides the Fourth Circuit's decision in USAF? Well, the cases that relate to, like, that talk specifically about the Eusekogin's not being a defense to acts that are violative of the norm, Seidermann, Flartega, and some of those cases in that line. So based on this court's decision in Seidermann, how relevant is that to this proceeding? I think it is very relevant. Because? Because it determined that torture can never be an official act of the state. Or alleged torture or actual? I'm just trying to figure out, this brings us into facial versus factual. So there's all kinds of layers here and I'm trying to work through them. Well, the act, I mean, any case, as the court is fully aware, it begins with the pleading stage. That's the only thing we can do. It should not be that all cases get resolved at the pleading stage. I've done sort of an informal survey of finding, trying to find out how many cases got through in the last 26 years, got through this claim that there was absolute deference under the SOI to what the executive says. And it's a handful. The whole concept is defeating the very statute that was created by Congress, not the court. And it is making an absolute mockery of this particular piece of legislation. But that is exactly the position the Second and Seventh Circuits have taken in opposition to the Fourth Circuit. And the Ninth Circuit. The concept that use cogens is a, that there cannot be immunity for use cogens violations. Now to give me the best Ninth Circuit court case, because I haven't gotten that from you. It's the Marcus case. It's Hillel. It's Strahano. H-I-A-L-A. But the Marcus case, there was no statement of immunity in that case. As a matter of fact, it was just the opposite. But the issue there is it's referring specifically to use cogens as a something which cannot, if it's a violation of that. It doesn't match up with the SOI, but it does match up with that there can be no immunity. And in this case, you're not claiming there was any torture. This case is an extrajudicial killing, right? Well, there also is a component of torture. If you shoot somebody in the back, leave him on the deck for a period of time, and then walk up and shoot him, that certainly could be a form of torture. Talk to me, I mean, about the Fourth Circuit case, because in that case, the court went a different route. But there was no initial SOI presented. Is that correct? There was from an entity that the government, our government. Not from DOJ or from the State Department. That's correct. Okay. Had there been, would the Fourth Circuit have gone a different route, do you think? No, because it said it wouldn't. Yeah. Okay. So they then said that regardless of whether there's an SOI, we do our own independent review. Is that how you interpret what the Fourth Circuit said? Absolutely. I think there are steps. The steps are, there is no immunity for use cogents. If there is any immunity, then we can take our own steps in which we determine, give some deference, I think the term they used was substantial weight. But in that case, they did not countermand, am I saying that right, the government in that case. Their position was consistent ultimately with the government. Are there cases where the courts have come out not consistent with the government? Yeah. There's the Barizi case, which is many years ago. There is- That was the 1940 or 20- 20. Ship related case, I think. Yes. There's the Republic of Philippines case, which was 1987. Those are the two prime. But the appellees continually refer that there's an unbroken line of cases in which deference was always granted, except for a few cases. It's correct, except when it's not. And did the district court err here in relying on facts other than those alleged in the complaint? Yes. You referenced it as a freewheeling sort of review. I'm sorry. I guess under what standards are you asserting motions for sovereign immunity are reviewed and can and should the district court be able to consider that kind of extrinsic evidence? It depends on whether it's 12b1 facial or 12b1 factual. And I think with 12b1 factual, then you can review, you can bring in facts, but there has to be an equal ability to bring in facts. And to resolve the question of whether the alleged conduct constituted torture as well? Well, I don't think that you can reach the ultimate issue at that stage. You can determine whether there's sufficient either factual or facial allegations that support the allegations. It's not a summary judgment. So what about when the conduct isn't disputed, but it is disputed whether the conduct was lawful because it occurred during war? Is that a factual question? That would be a factual question. But I apologize for interrupting, but if it's used cogent, it doesn't matter. Because if it's a, if it's torture or extrajudicial killing, those are violative of international norms, which have been incorporated in the Supreme Court has said that into US law. All right. We've taken you past your question. We'll give you by our question. We've taken you past your time. We'll give you two minutes. Thank you. Good morning, Jean-Claude Andre on behalf of Ehud Barak. I noted that the court has granted the government's motion to participate in oral argument and pursuant to an agreement between the government and Mr. Barak, we plan to give the government five minutes of our 15 minutes. Nine o'clock. Plaintiffs are asking this court to do what no court has ever done, which is reject a suggestion of immunity filed by the Department of Justice and the Department of State asserting that a foreign official acting in his official capacity is immune from suit. But didn't the Fourth Circuit say that it would be willing to do that? And basically from what they said in their case? Well, the Fourth Circuit case is actually different because there the United States said that the individual was not immune and the Fourth Circuit conducted it. But I thought the Fourth Circuit may have been pretty clear in saying we don't give absolute deference to the SOI. The Fourth Circuit was clear in saying that. So isn't that slightly different? Well, I guess up to this point, you're correct, no one has gone against the government. That was the point I was trying to make previously. But it sounds like the Fourth Circuit's not opposed to going a different route. No, I would agree with that, although we disagree with the Fourth Circuit's logic and it's holding. And so why is the Second Circuit better way to go than the Fourth Circuit? Because the Second Circuit's rule, even though it came out before the 2010 decision in Samantar, actually got it right. This court is not bound by, of course, either the Second Circuit or the Fourth Circuit, but it is bound by Samantar. And did the Supreme Court have the benefit of the Second Circuit? I'm trying to remember the timing when they did the precursor to Youssef. I believe, yes. So Mattar was 2009 and Samantar was 2010. So the Supreme Court, I believe, did have the benefit of the Second Circuit's opinion. So Judge Bea, actually, we agree with you entirely that Samantar absolutely decided the very question here today, which is that even for conduct-based immunity, and this is on page 324 of the Supreme Court's opinion, even for conduct-based immunity, the courts must defer if the Department of Justice and Department of State come in and suggest that someone is immune. But did Samantar really deal with common law immunity? It seems like it didn't really wrestle with that. It seems like the Supreme Court only addressed an issue under the FSIA. And in fact, the court didn't appear to reach the question whether Samantar could be immune under the common law. And instead, it remanded to let the district court decide. So I don't know if we know what the Supreme Court thoughts were, because it really didn't attempt to define the full scope of common law immunity. Isn't it possible there could be exceptions like the Fourth Circuit? But we don't believe there can be such exceptions. And we do believe that the Supreme Court, although perhaps it may be dicta, and of course, you know, this court is essentially bound by Supreme Court dicta, the Supreme Court was very clear. We're bound by Ninth Circuit Court dicta, but we're not bound by the Supreme Court dicta. That's our jurisprudence for whatever value it has. But so the page I cited from Samantar, page 324, the Supreme Court was very clear. It said, even if a suit is not governed by the act, referencing the FSIA, it may still be barred by foreign sovereign immunity under the common law. And so ultimately, the Supreme Court did send the question of whether the common law immunities would apply to the official. In that case, back to the Fourth Circuit, its statement was abundantly clear. And earlier in the opinion, the Supreme Court also laid out the history of these common law immunities and, you know, explained how they are preserved, except with respect to foreign states and their agencies or instrumentalities, because that's when the FSIA was enacted in 1976, Congress took that out. But everything else was still preserved. What about, I'm curious, your position on the relevance of Siderman, our own case law, to this particular case? Because it seems in Siderman, our court, you know, held that this Juice Kogan's violations, such as torture, cannot serve, cannot be sovereign acts. What, I'm just trying to figure out how to reconcile. I'm just asking all these questions because I think there's, as I indicated, just a lot of different layers here. And how relevant is that? Well, we think the Siderman actually helps our case because Siderman is part of, this court doesn't have a spoke. It helps your case, I'm curious, because it seems like it's more in line and it's what the Fourth Circuit relied on in making, you know, the route it took. Siderman helps us because it's part of an unbroken trend. Nothing binding this panel, you know, with a particular question here. But whether you're talking about Peterson, Siderman, Chiodian, all those cases recognize the same two-step procedure that Samatar made the law of the land. And so, although there is, you know, this other holding in Siderman about Juice Kogan's, what really is most salient is the fact that this court has repeatedly, both pre and post-Samatar, because the Peterson case actually was in December 2010 after Samatar and discussed Samatar. Mr. Andre, if Siderman says that torture can never be an official or sovereign act, can we distinguish that from extrajudicial killings? I mean, isn't that what the TVPA covers, both torture and extrajudicial killings? But the court doesn't need to get there because the TVPA doesn't abrogate the common law immunities that apply to officials when they've been asserted by their home state and agreed with by the United States. Is that consistent with what we held in Siderman? But again, Siderman was not addressing this particular question. Well, but it's quite a declaration and I'm just trying to figure out how we reconcile that. It seems like the plaintiff's alleged torture and appropriation of property by the state of Argentina during the military dictatorship and it says, given, I mean, the language specifically says, given this extraordinary consensus, we conclude that the right to be free from official torture is fundamental and universal, a right deserving of the highest status under international law. A norm of Jess Coogan's goes on and says that states engage in official torture cannot be doubted, but all states believe it is wrong. All that engage in torture deny it and no state claims a sovereign right to torture its own citizen. Under international law, any state that engages in official torture violates Jess Coogan's. That doesn't seem relevant to you here? Or how, I mean, how do we get to where you want us to go without or and address that? Because it seems to put us at least initially on the path of the Fourth Circuit or somehow to figure out how to address it. It's our own circuit. It wasn't their circuit law, but they seem to have adopted. So contrary to what Mr. Stormer said, the parties do dispute or would dispute the facts here. We don't agree that this was torture. We don't agree that this was an extrajudicial killing, but we're at the 12B1 stage. And at that stage, you know. We look at everything in the light most favorable to the plaintiff, or that's what I'm asking. What do we do at this stage in these kind of cases when it seems like it's disputed here? Sure. So even if you assume, again, we by all means disagree that this was torture, that would be a use Coogan's violation, but that still would not allow for this suit to go forward under the TVPA or under any other statute, because there's no use Coogan's exception to the common law immunity doctrines that kick in once a foreign sovereign has requested a statement of immunity and the United States has agreed to give one. Based on what authority? Based on based on Samatar, based on the Second Circuit in Matar. And also the fact that there's, so if you go back to the TVPA itself, there's no clear statement there in that statute, nor in its legislative history, that Congress intended to abrogate the very common law immunities that the Supreme Court discussed in the beginning of its Samatar opinion. And absent that clear statement then, all the TVPA does is create a cause of action. But just like 1983 creates a cause of action for certain constitutional tort, or Bivens recognized a certain cause of action for constitutional torts, there's still the qualified immunity doctrine, which says that certain officials, you know, are not liable to even, are not for official acts. Correct. But Seidemann says that torture and therefore extrajudicial killings are not official acts. And that never be basically. And that is disputed, but and Israel has said that these were official acts and they were not torture and that they were not extrajudicial killings and the United States has agreed. And once that determination is made, then the inquiry is over. We don't even get to the Seidemann question, which incidentally also, you know, Seidemann is the oldest of those three cases that I mentioned in this kind of unbroken trend of deferring to the State Department. Your position is that regardless of what we held in Seidemann, if there is a statement of an SOI, a statement of immunity, Seidemann doesn't apply. Correct. Because of separation of powers concepts. Correct. I see that there's five minutes left on our shared clock. So if the court has no further questions, I will yield the lectern to. Thank you. Good morning, Your Honors. I'm Louis Yellen from the Department of Justice. I'm here today for the United States. We're grateful for the opportunity to present the government's views. Given my limited time, I'd like to make three points, which I hope are responsive to some of the concerns that I've heard the court raise during this argument. The first, I'd like to specifically address Seidemann. Seidemann, I think it's quite critical, held that notwithstanding allegations of use Kogan's norms in that case, the claims did not come within an exception to a State's foreign sovereign immunity under the FSIA. I think that's important because it shows that immunity and allegations of unofficial acts are two separate things. So an actual holding in Seidemann was that the allegations were insufficient to invoke the court's jurisdiction under the FSIA. As my friend suggested, the government, the United States here, the State Department accepted a diplomatic request from the State of Israel, made its own evaluation and determined that the acts which are at issue in this case were official acts. And the State Department determined to suggest the immunity of Mr. Barak based on its own assessment that these acts were official. Now, under the Supreme Court's precedent and this court's precedent, that determination is controlling. I think there are three elements in Samantar which show that it's controlling. And Judge Bea, I think, also showed that it's not simply dicta. The question in Samantar was whether or not the Foreign Sovereign Immunities Act controlled the immunity of foreign sovereigns. In answering that question, no. The Supreme Court traced the history of foreign sovereign immunity in the courts and determined that before the FSIA had been enacted, there was a practice of absolute deference to the executive branch, to the State Department's immunity determinations. And as Your Honor read in the quotation just a little bit ago, the cases against foreign officials were rare, but the same procedures were followed. At the end of the Samantar opinion at page 323, the Supreme Court held, we have been given no reason to believe that Congress saw as a problem or wanted to eliminate the State Department's role in determinations regarding official immunity. Now, that was part of the reason the court held that the FSIA is not applicable to claims against foreign sovereigns. And it's consistent with this court's own statement in Tewitian that if the FSIA did not control the immunity of foreign officials, then the court said in Tewitian, presumably we would once again be required to give conclusive weight to the State Department's determination of whether an individual's activities fall within traditional exceptions to sovereign immunity. But I thought in the holding incitement was based on the reasoning that Congress didn't create an exception in the FSIA. Isn't that what they decided? And if so, how does that affect what you just said right now? That's exactly correct, Your Honor. The point that I'm trying to make by relying on the holding incitement is that this court recognized there's a difference between allegations in a complaint, which might include allegations of Hughes-Cogan's violations, and principles of immunity, which govern the jurisdiction of the courts. And the court concluded incitement that notwithstanding allegations of Hughes-Cogan's violations, Congress had not given the court's jurisdiction to entertain claims of Hughes-Cogan's violations because there was no exception that's applicable. That's only to show that allegations of Hughes-Cogan's violations are not sufficient to overcome the branch of government, their Congress and the FSIA, here in the foreign official immunity context, the executive branch through the State Department, those immunity principles that are applicable. This gets to the third point I was hoping to make, which is about allegations and the foreign policy implications of cases such as these. As the court knows, the foreign policy powers of this country are vested in the political branches, in Congress and in the executive branch. When Congress or the political branches acting together create standards for this court to apply in adjudicating claims involving foreign states, this court has workable rules for it to apply, knowing that the politically responsible branches that have control of our foreign policy have determined that those principles are appropriate for this court to apply. In the absence of any codification, the historic practice has been for the courts to defer to the executive branch as one of the two political branches that's responsible for our foreign policy. And the practice goes back decades and is very well documented in the Samatar opinion and, as I read a moment ago, in this court's Chewedian opinion. And it is for that reason that courts look to the executive branch's articulation of the principles governing foreign sovereign immunity rather than create them on their own out of whole cloth. With respect to the Fourth Circuit's decision, I would suggest the following, Your Honors. First, that decision in some sense in that particular case had much lower cost in terms of outcomes because the United States had determined that that defendant was not immune from suit. And so there wasn't a conflict between the court's determination and the executive branch's determination. To hold anything contrary in this case would create a conflict with the executive branch's determination. Let me, if I can ask you a question, because in the suggestion of immunity, I guess you or the government, you're representing the government here, notes the fact that the Supreme Court denied cert in Samantar after, or Yousef, I'm sorry, Yousef versus Samantar, I get a little confused. After the Fourth Circuit held that the executive's suggestion of immunity is not entitled to absolute deference on questions involving conduct-based immunity and that immunity would not extend to human rights violations. So doesn't that imply approval of the Fourth Circuit's holding in that case? Are we not to read that? And in fact, you point out that the Supreme Court denied cert again after Samantar's bench trial in that case. What do we make of that? It's very well established, Judge Munguia, that the Supreme Court's denials of certiorari have nothing, no bearing whatsoever on the merits of any underlying claims. And in fact, the United States had suggested after the Yousef case that the court should grant, vacate, and remand without hearing the case on the merits because of, in the government's view, the error that the Fourth Circuit had undertaken. The Supreme Court decided not to do that, but I would point this court to the clear statement that the court made in Samantar. And I think it's also worth pointing out that the cases in Samantar, discussed in Samantar, involving foreign officials, all were conduct-based cases. Heaney, Waltier, and Greenspan, two of those cases involved consuls. And my friend, in his reply brief, suggested that consuls have status-based immunity because the executive branch has to determine whether or not the consuls are consuls. Well, that's status in a trivial sense, just in the same way that the executive branch has to determine whether any defendant is an official. And a status-based immunity is a broad immunity from any sort of suit based on the person's incumbent status. That is, whether they're the head of state or an accredited diplomat. But consuls, like the vast majority of officials, enjoy only conduct-based immunity. And the third case that I had mentioned, Greenspan, did not even involve consuls. It involved provincial officials from Newfoundland. And the Supreme Court cited those cases approvingly as the procedure that was followed before the FSIA was enacted. And it was that procedure that governed the determination of whether foreign officials are immune from suit, namely a submission from the State Department of a suggestion of immunity or, barring that submission from the State Department, a determination by a court that the clearly articulated principles that the State Department had already made would govern. The Heaney case used such a mechanism. I think we've taken the best of your time. Can I ask just one more question? Thank you. Can this court decide the political question doctrine based on the record that we have here? And what's your position on the political question doctrine? Your Honor, the government hasn't taken any position on any issue besides the effect of the suggestion of immunity. Thank you, Your Honors. Mr. Stormer, we'll give you a couple of minutes. Thank you, Your Honor. Your Honor asked where in Samantar the difference between status-based and conduct immunity lies. And it lies in footnote 12, where it specifically references that the legislative history makes clear that Congress did not intend the FSIA to address position-based individual immunities. So it's footnote 12 where that comes from. Second issue is the Marcos cases, Hillel and Trajano, both recognize an exception to FSIA for individual officials. Third, there was a reference to the legislative history. The legislative history has a component that is quite clear. It says that, it expressly states that the committee does not intend these immunities to provide former officials with defense to a lawsuit brought under this litigation. So it was specifically addressed in the legislative history. And there was a discussion and the decision ultimately was made to present a TVPA which had no common law immunities as part of it. And that is because at the time it was passed, there was no history of common law immunities for conduct-based individual components. Well, one thing is for the legislative history, which we don't know if it was read by any senator or congressman before he voted to say that the legislation will not provide immunity. Another thing is there's nothing in the legislative history which says that we are abrogating the common law of unity by this legislation. Is there? Well, I would say that that sentence absolutely indicates that they do not intend to give as a defense to the lawsuit, former officials. Through the legislation. Through the legislation, yes. Right. Okay. So the statement was no, that there has never been, the court is there, we're asking the court to strike out in something that has never happened before. The opposite is true. Affirming the court below would make this the first case in this circuit to ever confer immunity for a use cogence violation. The thread that has run constantly through all of the litigation in the Ninth Circuit as use cogence violations are not subject to a claim of immunity. Okay. Thank you very much. Thank all counsel for this presentation. And Dojan versus Barak is submitted for decision.
judges: Bea, Murguia, Bastian